Richard F. KLONOSKI, M.D.,
Plaintiff/Appellant,

v.

CARDIOVASCULAR CONSULTANTS
OF CAPE GIRARDEAU, INC., C.R.
Talbert, Jr., M.D., Allen L. Spitler,
M.D., James B. Chapman, M.D., William K. Lafoe, M.D., Kenneth W. Retter, M.D., Defendants/Respondents.

No. ED 84920.

Missouri Court of Appeals,
Eastern District,
Division One.

May 24, 2005.

Rehearing Denied Sept. 6, 2005.

Michael L. Jackson, Jackson, MO, for appellant.

Matthew M. Mocherman, Cape Girardeau, MO, (attorney for Cardiovascular Consultants of Cape Gireardeau, C.R. Talbert Jr., Allen L. Spitler, James B. Chapman, William K. Lafoe, and Kenneth W. Retter), for respondent.

SHERRI B. SULLIVAN, J.

### Introduction

Richard F. Klonoski, M.D. (Appellant) appeals from the trial court's judgment denying his claim for damages for breach of an employment contract between Appellant and Cardiovascular Consultants of Cape Girardeau, Inc., C.R. Talbert, Jr., M.D., Allen L. Spitler, M.D., James B. Chapman, M.D., William K. LaFoe, M.D. and Kenneth W. Retter, M.D. (the Group). We affirm.

### Factual and Procedural Background

Appellant and the Group entered into an employment agreement (the Agreement) on July 31, 1998. By the terms of the Agreement, Appellant was to practice medicine with the Group "for a term of 18 months, beginning on the 7th day of October, 1998 and ending on the last day of the 18th month of this practice." The Agreement provided that Appellant would diligently devote his time, skill and effort to the practice of medicine throughout the term of the Agreement, exclusively within the employ of the Group, and the Group would pay Appellant during the first 12 months of the contract a base salary of $20,000.00 per month with bonus incentives for individual performance goals, and during months 13–18 of the contract, Appellant's compensation would be "productivity based at 80% of individual net bookings after equal overhead applied."

Appellant began work with the Group on October 7, 1998. For the first 12 months of the parties' employment relationship, which ran from October 7, 1998 through October 6, 1999, Appellant drew from the Group the agreed base salary of $20,000.00

per month. The parties concede that no bonus incentives were earned or paid.[1] Appellant continued on with the Group from October 7, 1999 through the end of April 2000. It was during this period that Appellant was to be compensated on the basis of productivity "at 80% of individual net bookings after equal overhead applied."

The contract term "bookings" is not defined in the Agreement. Appellant maintains that bookings are when services are rendered, and thus he should get paid for services he rendered before October 7, 1999, but did not bill until after that date. The Group interprets bookings as when services are billed, but made an exception in Appellant's case because the Group determined Appellant had been hoarding services rendered until after he became production-based, and then billed them all to increase his compensation as production-based. The Group did not pay Appellant for services he rendered before October 7, 1999, but billed after that date.

Appellant brought a breach of contract claim against the Group for monies earned, but not paid, for services rendered during the last six months of the parties' employment relationship, when Appellant was no longer a salaried employee and was to be paid solely on the basis of those "bookings" which Appellant produced for the Group.

Neither party requested findings of fact and conclusions of law. The trial court entered its judgment finding all issues in favor of the Group. This appeal follows.

*Point on Appeal*

Appellant maintains that the trial court's judgment is not supported by substantial evidence, is against the weight of the evidence and erroneously applies the law because the trial court failed to define and apply the contract term "bookings" and failed to enforce the clear and unambiguous language of the Agreement's formula for determining Appellant's compensation for his services during the final six months of his employment with the Group.

*Standard of Review*

The standard of review in a court-tried case is governed by *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo.banc 1976). The judgment of the trial court will be affirmed unless there is no substantial evidence to support it, it is against the weight of the evidence or it erroneously declares or applies the law. *Id.* Neither party in this case requested findings of fact or conclusions of law, nor did the trial court make any findings of fact. As such, Supreme Court Rule 73.01(a)(3) provides that "[a]ll fact issues upon which no specific findings are made shall be considered as having been found in accordance with the result reached." *Golden Delta Enterprises v. City of Arnold*, 151 S.W.3d 119, 121–122 (Mo.App. E.D.2004).

*Discussion*

Whether a contract is ambiguous is a question of law. *Thomas v. B.K.S. Dev. Corp.*, 77 S.W.3d 53, 59 (Mo.App. E.D.2002). In determining whether a contract is ambiguous, the court must consider the whole instrument and the natural

1. Appellant was paid a total of $180,000.00 for the period from January 2, 1999 to September 30, 1999 ($20,000.00 salary per month × 9 months). If he had been paid by the productivity-based compensation formula during that same period of time, based on his bookings, he would have only earned $91,877.80. For the very first month of his productivity-based compensation period, Appellant presented bookings that represented a 40% increase over his most recent month of bookings (which was his last salaried month).

and ordinary meaning of the language. *Id.* The mere fact that the parties disagree on the subject does not render the document itself ambiguous. *Id.* The test is whether the disputed language, in the context of the entire agreement, is reasonably susceptible of more than one construction giving the words their plain and ordinary meaning as understood by a reasonable, average person. *Id.* Where the contract is ambiguous, use of extrinsic evidence for interpretation is proper; the resolution of the ambiguity is a question of fact. *Id.*

Appellant and the Group agree that the term "bookings" is undefined within the Agreement and ambiguous. Appellant maintains that "bookings" are defined by the date of service. The Group maintains that "bookings" are determined by the date of billing.

Mr. James Erlacker (Erlacker), who had been the accountant for the Group for 10 years, testified that it was his understanding that a booking was when all paperwork was done and prepared, and the bill could be sent out to the insurance company or other appropriate payee. In other words, when a billing was sent out, it became a booking.

Dr. William LaFoe (LaFoe), a partner and member of the Group, testified that the performance of a doctor was not based upon when his service was performed, but when the service was billed, and that a doctor would receive no credit for the services he performed until the service had been billed. LaFoe stated that the productivity formula used by the Group, taking bookings times (x) 80%, less (-) expenses was used to determine how hard each physician was working, but the formula did not entitle the individual doctor to ownership in the particular bookings that came in that month.

Cindy Gerler (Gerler), an office manager at the Group for 10 years and an employee of the Group for a total of 25 years, testified that the figures which were utilized to determine Appellant's productivity during the last six months of Appellant's employment with the Group did not include the Group's billings for services rendered by Appellant prior to October 7, 1998, while Appellant was a salaried employee. Gerler testified that there was a general feeling within the Group that Appellant was holding his paperwork until he became production-based and that, therefore, in Appellant's case, the date of service determined whether a particular account would be viewed as booked during the first 12 months of Appellant's employment or during the last six months of the contract when Appellant's compensation was to be based solely on Appellant's production. When Appellant became a production compensated individual in October of 1999, the Group made a decision not to give him credit for bookings that represented services that were provided during the first 12 months of his employment. The Group had a meeting in which the owners voted how to handle the situation, and it was felt strongly by all of them that Appellant had tried to shift bookings from the first 12 months over to the productivity period so that he would get paid more. The Group did not believe that would be fair to the rest of the doctors and they made a decision to keep the bookings they believed were the property of the Group.

As a result of this decision, LaFoe stated that Appellant received no credit as a production-based employee for work performed prior to October 7, 1999, regardless of when the work was billed.

Appellant acknowledged that he was slow getting his paperwork to the Group through late March or April of 1999 and stated that the Group actually withheld Appellant's paychecks for a period of time until Appellant got his paperwork up to date. Appellant testified that he brought

his paperwork current in or about May of 1999 and remained current with his paperwork after that date.

We find that the Group's interpretation, adopted by the trial court, is supported by substantial evidence. The testimony of Erlacker, LaFoe and Gerler supports the interpretation of "booking" as when the service is billed. The trial court clearly found their testimony credible, and we will not disturb that finding. *Henderson*, 78 S.W.3d 147, 150 (Mo.App. E.D.2002). Appellant's own deposition testimony supports their construction, when he concedes that "bookings" and "billings" are equal terms, and that LaFoe represented to him that "bookings" as the term was used in the Agreement meant receivables, and receivables meant that bills had gone out.

However, what is troubling is that the Group decided to treat Appellant's bookings as from the date of service after his production-based compensation period started, because they felt he had been hoarding bookings. The issue thus posed is, was this inconsistent treatment permitted by the Agreement? There is no language in the Agreement strictly prohibiting this treatment. However, it is assigning a meaning to the term "booking," which is inconsistent with the ordinary and usual one they had supplied to the ambiguous term.

 Erlacker opined in a letter to Gerler that he did not think it was necessary to change the method of allocation for Appellant unless it could be shown that he had deliberately delayed billings in order to increase his own profitability which in turn would reduce the profitability of other physicians in the Group. The Group met and decided this indeed was the case. The trial court agreed. Whether Appellant actually was purposely withholding his bookings or not was an issue of credibility for the trial court, and we will not revisit that issue on appeal. *Henderson*, 78 S.W.3d at

150. However, we do note that Missouri law implies a covenant of good faith and fair dealing in every contract. *Koger v. Hartford Life Ins. Co.*, 28 S.W.3d 405, 412 (Mo.App. W.D.2000). When a party, in bad faith, utilizes contract language that allows unilateral action to improperly deny the other party from expected benefits flowing from the contract, he breaches this covenant. *Id.*, citing *Martin v. Prier Brass Mfg. Co.*, 710 S.W.2d 466, 473 (Mo. App. W.D.1986). By hoarding bookings, and then arguing that it should be the date of service, not billing, that applies, Appellant appears to be doing this very thing.

Appellant testified that the Group's practice of looking to the date of rendition of service for the purpose of determining whether a "booking" would be credited to the first 12 months or the last six months of Appellant's employment was consistent with Appellant's understanding of how the contract would be applied. However, the Group's practice of looking to the date of rendition of service was an exception they took with regard to Appellant for the mere purpose of handling his alleged hoarding of paperwork for services performed within his first year of employment, when he was salary-based, in order to submit it to the Group in his last six months of employment, when he was production-based. For all other intents and purposes, the evidence establishes that bookings were determined at the time of billing, not at the time of service.

Further, Appellant knew that unless the office was provided the underlying paperwork, the service could not be billed. He understood that if a doctor was not doing his paperwork, or doing a poor job on his paperwork, the services could not be billed. It defies logic that a doctor would be paid based on something that was not, or could not be, billed. Under Appellant's interpretation of his compensation, there would be nothing from which to subtract

overhead. Appellant himself rushed to complete his paperwork when Gerler told him if he did not get his bookkeeping up to speed he would not get credit for his production.

Appellant also maintains that the Agreement's portion that states that during months 13–18 of the contract, Appellant was to receive "80% of (his) individual net bookings after equal overhead applied," clearly means that equal overhead would be subtracted from his gross earnings first, and then the 80% figure would be applied. However, Erlacker and Gerler testified that the Group's practice in dealing with physician employees was to apply the 80% multiplier to gross bookings and then deduct overhead. Dr. Lipoff, another production-based employee, also was paid this way. Gerler and Erlacker informed Appellant of this method of compensation on several occasions during his employment, and Appellant never disputed it. The first time Appellant notified Gerler of his dissatisfaction with the method was three months after the Agreement expired, in July 2000.

Based on the foregoing, we find that the trial court's judgment adopting the Group's interpretation of the production-based method of compensation to be supported by substantial evidence.

■ Appellant also maintains that the Group should have paid him for bookings entered after April 30, 2000. However, bookings are determined at the time they are billed, and Appellant was no longer in the Group's employment after April 30, when they were billed. Moreover, there was substantial evidence in the record that the Group made every effort to book all of Appellant's services before the termination of the Agreement. In April, the Group's doctors instructed Gerler to book as much of Appellant's services as possible. Gerler stated that on April 21, when Appellant submitted to her all of his paperwork that he believed was necessary to book his services, which was several months behind, she instructed her entire staff to work at all costs to bill as much of Appellant's services as possible. During the last nine days of April, Gerler worked overtime to help the booking department; coders and transcriptionists worked weekends; and the Group hired a former employee to work at home exclusively on Appellant's bookings. Michelle Covrick, a coder with the Group, testified that a new coder started on April 3 and exclusively handled Appellant's bookings while she took care of the other five doctors' bookings.

The Group was not able to book all of the $172,000.00 of services submitted by Appellant based upon missing documentation and incomplete dictation, and even had all the paperwork been complete and accurate, there was not enough time to complete all of the bookings prior to May 1. LaFoe testified that had Appellant been current with his bookkeeping, he would have been given credit, as bookings, for the $90,000.00 of services that were booked after his contract expired, except for maybe a couple of procedures that he had just recently performed in April.

Based on the above, coupled with the fact that the Agreement itself does not provide for post-termination compensation, we find Appellant's argument without merit.

For all the aforementioned reasons, we reject Appellant's assertion of trial court error. Appellant's point on appeal is denied.

The judgment of the trial court is affirmed.

GARY M. GAERTNER, SR., P.J., and BOOKER T. SHAW, J., concur.