**ATC COMPANY, INC., Plaintiff,**

v.

**Steven M. MYATT and Jeanne Myatt, Respondents,**

and

**Pinewoods Investments, LLC, Appellant.**

**No. ED 97871.**

Missouri Court of Appeals,
Eastern District,
Division Three.

Jan. 8, 2013.

Paul J. Puricelli, St. Louis, MO, for Appellant.

John C. Maxwell, St. Charles, MO, for Respondent.

**ROBERT G. DOWD, JR.,** Presiding Judge.

Pinewoods Investments, LLC ("Purchaser") appeals from the judgment of the trial court awarding earnest money, deposited pursuant to a real estate contract, to Steven and Jeanne Myatt ("Seller").[1] This appeal rests on our interpretation of an extension agreement signed by the parties and its effect on the original contract. We reverse and remand.

Purchaser and Seller entered into a Sale Contract on July 18, 2003, under which Seller agreed to sell four tracts of land to Purchaser. The Sale Contract provided that the sale would involve two closings. Tracts one and two would be part of the first closing, scheduled to occur on March 15, 2004. Tracts three and four would be part of a second closing five years later as Sellers lived on those tracts of land.

The Sale Contract required Purchaser to deposit $40,000 in earnest money, to be retained by the title company until the second closing. The Sale Contract also contained a number of contingencies that would allow Purchaser to avoid closing on the property and to recover the earnest money in full.

One such contingency was a feasibility study regarding Purchaser's contemplated development. Acceptance of the feasibility study was to be within Purchaser's sole discretion. If Purchaser rejected the feasibility study, it could cancel the Sale Contract without breach and would be entitled to a full return of the earnest money, plus accrued interest.

---

1. The plaintiff in the case below, ATC Company, Inc. ("ATC") is not a party to this appeal. ATC was the escrow agent for the real estate contract between Purchaser and the Seller and held $40,000 in earnest money to be credited to Purchaser at the second closing. After receiving claims to the earnest money from both parties, ATC filed an interpleader action to determine which party had rights to the earnest money. ATC was dismissed from this case at the beginning of the trial by stipulation of the parties. The parties to this appeal are Purchaser and Seller, both of whom assert a claim to the earnest money.

Purchaser had difficulty securing required zoning approval for the first closing and requested an extension, moving the date of the first closing from March 15, 2004 to April 15, 2004. The parties therefore entered into a Real Estate Sale Contract Extension Agreement ("Extension Agreement"). In consideration for the change in date, Purchaser paid Seller an additional $15,000 as a "non refundable earnest deposit" and the parties agreed, in pertinent part, as follows:

1. Purchaser agrees that the Contract is no longer contingent, and is binding on Purchaser and Seller, and in the event the property does not close for any reason, Sellers will be entitled to the full FORTY THOUSAND AND NO/100THS DOLLARS ($40,000) earnest money without any claim thereto by Purchaser.

The terms "Contract" and "property" were not defined in the Extension Agreement. The closing for tracts one and two occurred thereafter without dispute.

In 2008, Purchaser completed a feasibility study for tracts three and four. After reviewing the study, Purchaser declined acceptance for the second closing and decided to void its obligations under the Sale Contract based on the feasibility contingency. Purchaser then requested that ATC return the earnest money based on the original terms of the Sale Contract. In response, Seller requested that ATC return the earnest money based on the terms of the Sale Contract as modified by the Extension Agreement. Based on these competing claims, ATC filed its interpleader action.

At trial, Purchaser argued the Extension Agreement eliminated contingencies for the first closing, but not for the second closing. Seller argued the Extension Agreement eliminated all contingencies from the Sale Contract and thus applied to both closings. The trial court agreed with Seller and entered judgment in their favor. This appeal follows.

In its sole point on appeal, Purchaser argues that the trial court erred in ruling that the Extension Agreement modified the Sale Contract to waive all contingencies for the second closing. We agree.

■ In a court-tried case, we will sustain the trial court's judgment unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or applies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

■ The cardinal rule in contract interpretation is to ascertain the intention of the parties and to give effect to that intention. *Renco Group, Inc. v. Certain Underwriters at Lloyd's*, 362 S.W.3d 472, 477 (Mo.App. E.D.2012). If the contract is not ambiguous, the intent of the parties is determined based on the contract alone. *Id.*

■ Whether a contract is ambiguous is a question of law that we review *de novo*. *Klonoski v. Cardiovascular Consultants of Cape Girardeau, Inc.*, 171 S.W.3d 70, 73 (Mo.App. E.D.2005). The test to determine whether there is an ambiguity is whether, in the context of the entire agreement, the disputed language "is reasonably susceptible of more than one construction giving the words their plain and ordinary meaning as understood by a reasonable, average person." *Id.* An ambiguity must come from within the four corners of the contract; extrinsic evidence cannot be used to create an ambiguity. *Teets v. American Family Mutual Ins. Co.*, 272 S.W.3d 455, 462 (Mo.App. E.D.2008).

■ Once an ambiguity has been found, the parties' intent can be determined through the use of extrinsic evi-

dence. *Id.* Resolution of an ambiguity through extrinsic evidence is a question of fact to be determined by the finder of fact. *Id.* Only where there is no evidence showing the parties' intent will we construe an ambiguity against the party who drafted it. *Graham v. Goodman,* 850 S.W.2d 351, 355–56 (Mo. banc 1993).

■ Before reviewing the contract language in dispute, we examine the rest of the Extension Agreement to determine the purpose of this document. To understand the parties' reason for executing the Extension Agreement, we need not look further than the WHEREAS clauses in the first half of the Agreement. These clauses state as follows:

WHEREAS, the Parties entered into a SALE CONTRACT dated July 18, 2003; and

WHEREAS, the last date for closing on the aforesaid Contract was March 15, 2004; and

WHEREAS, *Purchaser wishes to extend the Contract* until April 15, 2004.

NOW THEREFORE, in consideration of the agreements herein made and *Sellers agreeing to extend the time of closing,* the Parties do hereby agree as follows:

(emphasis added).

The parties use the word "Contract" with a capital "C" in the second and third WHEREAS clauses and include the word in the phrase "aforesaid Contract" in the second clause. "[A]foresaid" requires us to look earlier in the document and must refer to the "SALE CONTRACT" mentioned in the first WHEREAS clause. Therefore, it is reasonable that "Contract" refers to the Sale Contract as a whole.

However, the context of these clauses suggests a different meaning for the word "Contract." The emphasized language in the third WHEREAS clause and the NOW

THEREFORE clause is nearly identical. It is reasonable to read these clauses together to mean that Sellers agree to extend the time of the first closing (originally set for March 15, 2004) until April 15, 2004. Under that reading, "Contract" refers to the first closing alone. Even before reviewing the disputed language, then, the Extension Agreement is ambiguous as to whether it modifies the Sale Contract as a whole or merely modifies the first closing.

Looking to the disputed language, the first paragraph of the Extension Agreement states:

Purchaser agrees that *the Contract is no longer contingent,* and is binding on Purchaser and Seller, and in the event the property does not close for any reason, Sellers will be entitled to the full ... $40,000 earnest money without any claim thereto by Purchaser.

(emphasis added).

This paragraph contains two independent clauses and we will address them separately. The first clause in the sentence provides that the "Contract" is no longer contingent. Because the word "Contract" is ambiguous earlier in the Extension Agreement, that ambiguity continues here. It is reasonable that "Contract" refers to the Sale Contact in its entirety. Under this reading, the parties' intent would be to remove all contingencies in the contract for both closings as consideration for the change in date on the first closing. However, it is also reasonable that "Contract" refers to the first closing alone. Under this reading, the parties' intent would be to remove contingencies for only the first closing as that closing would be the only one extended under the Extension Agreement. Therefore, the word "Contract" in paragraph one "is reasonably susceptible of more than one construction" and is ambiguous.

■ Looking at the second clause in this sentence, Seller would be entitled to the earnest money in full if "property" did not close. If the purpose of the Extension Agreement was simply to extend the closing date for tracts one and two, it is possible the "property" refers solely to tracts one and two. However, "property" could also refer to the "Subject Property" in the Sale Contract, encompassing all four tracts of land. Therefore, the word "property" in paragraph one is "reasonably susceptible of more than one construction" and is ambiguous as to whether it refers to the Subject Property as a whole or merely refers to tracts one and two.

■ However, determining that the Extension Agreement is ambiguous does not end our analysis. Contract ambiguity is a two step process. The first step is to determine whether an ambiguity exists. If there is no ambiguity, the intent of the parties is determined by the unambiguous words of the contract and the analysis ends. However, if there is ambiguity, the intent of the parties must be determined by looking outside the contract. We have resolved the first step by determining that "Contract" and "property" within paragraph one of the Extension Agreement are ambiguous. Therefore, we must move to the second step and look outside of the Extension Agreement to determine the parties' intent.

■ Purchaser suggests we immediately construe the contract against Seller, as drafter of the Extension Agreement. However, the law Purchaser cites is the law for contracts of adhesion. When the contract is not an adhesion contract, we will only construe the contract against the drafting party as a last resort if there is no evidence showing the parties' intent. *Burrus v. HBE Corp.*, 211 S.W.3d 613, 619 (Mo.App. E.D.2006). The Extension Agreement is not a contract of adhesion,

thus we must look outside the contract to determine the parties' intent.

The trial court heard testimony from both parties regarding their understanding of the Extension Agreement over a continuing objection from Sellers. The court never explicitly ruled on that objection, but did sustain similar objections regarding the admission of parol evidence prior to allowing the continuing objection. When the court entered its judgment, it did not explicitly state whether the court found the Sale Contract and Extension Agreement to be ambiguous or not. Therefore, based on the trial transcript and judgment, we cannot determine the legal reason for the judgment in Seller's favor. The court either determined (a) the Extension Agreement was not ambiguous or (b) the Extension Agreement was ambiguous and the ambiguity should be resolved in favor of Sellers.

Following the judgment, Purchaser filed a motion for new trial that the trial court denied without making specific findings. Purchaser's motion for a new trial requested that the trial court set aside its judgment so that Purchaser could present evidence that the Extension Agreement was ambiguous. Again, however, we do not know if the motion for new trial was denied because the trial court believed (a) the Extension Agreement was not ambiguous or (b) the trial court already determined the Extension Agreement was ambiguous and had resolved the ambiguity in Seller's favor.

■ Because our *de novo* analysis concludes that the Extension Agreement is ambiguous, that ambiguity must be resolved. Resolving a contractual ambiguity is a question of fact for the fact-finder to resolve. *Teets*, 272 S.W.3d at 462. Because the record on appeal is silent as to whether the trial court resolved the ambi-

guity, we remand for findings on this issue. If the trial court already resolved the ambiguity in favor of Seller, we ask for clarification. If the trial court has not resolved the ambiguity, we instruct the trial court to consider extrinsic evidence of the contractual intent of the parties at the time they signed the Extension Agreement. The trial court may decide whether this contractual intent can be determined from the testimony already heard over continuing objection or whether a new hearing is needed.

The judgment of the trial court is reversed and remanded for further proceedings consistent with this opinion.

ROY L. RICHTER, J. and ANGELA T. QUIGLESS, J., concur.