**CENTRAL STONE COMPANY,**
Plaintiff/Respondent

v.

**Daniel WARNING,**
Defendant/Appellant.

**No. ED 99480.**

Missouri Court of Appeals,
Eastern District,
Northern Division.

Nov. 5, 2013.

Russell J. Kruse, Concordia, MO, for appellant.

James A. Hansen, Quincy, IL, for respondent.

## OPINION

CLIFFORD H. AHRENS, Judge.

Daniel Warning ("Tenant") appeals from the judgment of the trial court awarding $51,100 in damages to Central Stone Company ("Landlord") on its breach of contract claim following a bench trial. Tenant contends that the trial court improperly considered parol evidence in construing the lease executed on May 3, 2010 ("May 2010 Lease"). In the alternative, Tenant argues that if the May 2010 Lease is ambiguous, the trial court failed to construe it against the drafting party, Landlord.

 Viewed in the light most favorable to the judgment, the evidence is as follows. Tenant, a farmer, leased farmland ("Oyster Farm") from Landlord since 1993. Agents of Landlord prepared and customized leases for renters of Landlord's various farm properties. The May 2010 Lease for Oyster Farm, a three-year lease beginning on January 1, 2010, was executed on May 3, 2010 while the previous lease was still in force.[1] In prior leases the annual rent was due by December 31st of each year. The May 2010 Lease raised the annual rent to $51,100, and provided that the due date for the annual rent was April 1 of each year of the lease. Tenant had possession of Oyster Farm throughout 2010, but did not raise any crops, apparently because of excessive water. However, Tenant maintained crop insurance and enrolled in the USDA Direct and Counter-Cyclical Program. Tenant did not pay rent to Landlord in 2010. Neither the May 2010 Lease nor the prior lease stated that if some or all of Oyster Farm could not be farmed then the annual rental payment would not be due. On April 13, 2011,

Landlord sent a letter to Tenant stating that he owed rent for 2010 and 2011. Tenant did not pay. In May 2011, Landlord filed suit against Tenant seeking $51,100 in back rent for Oyster Farm. Tenant filed a counterclaim under quantum meruit for the value of improvements that he made to Oyster Farm and for other uncompensated work done on and to Oyster Farm that benefited Landlord over a period of several years.

The cause was bench-tried on December 18, 2012. A number of exhibits were introduced, including a copy of the May 2010 Lease, the demand letter sent by Landlord to Tenant dated April 13, 2011, and a number of photos. David Sivill, the land manager for Landlord since 2003 who handled the farm properties and leases thereto for Landlord, testified, Duane Harsell, the operations manager and a vice-president of Landlord, also testified for Landlord. Tenant and his son testified on behalf of Tenant. Sivill testified that he never told Tenant in 2010 that he could farm Oyster Farm rent-free that year and never discussed the wet conditions of Oyster Farm in that year. He stated that Tenant prepared Oyster Farm for planting in 2010. Sivill said that Tenant never paid the rent due for 2010, and that he sent him a demand letter on April 13, 2011 for $51,100, which also served as notice that the May 2010 Lease was terminated. On cross-examination Sivill testified that Landlord had never waived the rent on Oyster Farm if it could not be planted. He had no idea why the rent for 2010 was not demanded at the time of the signing of the May 2010 Lease or shortly thereafter.

Harsell testified that he frequently saw Tenant in 2010 following the execution of

---

1. The parties agree that the May 2010 Lease was to be effective from January 1, 2010 until December 31, 2012. There was a typographical error to the effect that the start date was "January 1, 1020" that Sivill noticed and corrected manually, but his correction was also inaccurate as he changed the start date to "January 1, 1010."

the May 2010 Lease, sometimes regarding negotiations over purchasing property owned by Tenant and sometimes at meetings for the Union Drainage District. Harsell said that Tenant frequently acknowledged that he owed Landlord rent for Oyster Farm for 2010. He stated that "at least once a month" Tenant brought up the issue of the payment of rent for Oyster Farm for 2010, indicating that he needed to get a check to Landlord, that he owed Landlord cash rent. Harsell was aware that Tenant was apparently receiving money from crop insurance for Oyster Farm, as Tenant kept telling him that he had received a payment, that "[he] got his money, we deserved to get our money." Harsell repeatedly told Tenant that he had nothing to do with rent, and that Tenant needed to talk to Sivill.

Tenant testified that in late 2009 he had done some work on Oyster Farm to prepare it for farming in 2010. He stated that he had talked to Landlord in early 2010 about entering into a new lease to extend to 2012, the existing lease being due to terminate in 2010. He was aware that Landlord was going to increase the rent from $80 per acre to $100 per acre. Tenant admitted signing the May 2010 Lease, but stated that he did not review it prior to signing it, and that he did not ask Sivill any questions about it. He stated that he did not pay Landlord $51,100 in rent for 2010, and did not do so after he received the April 13, 2011 demand letter. Tenant claimed that "[w]e always had an oral agreement that if it was too wet to farm I didn't have to pay." He said that he had made this alleged oral agreement with Sivill's predecessors, and not with Sivill, but claimed that they had talked about it at drainage board meetings, though he never discussed the issue with Harsell. Tenant averred that before 2010 there had been years when he did not pay Landlord rent for Oyster Farm because it had been too wet, but admitted that in 2008 he paid Landlord money for rent despite the wetness because of a government program that compensated him for the flooding. He claimed that Landlord's agents never asked him for the rent in 2010 when he saw them at various meetings and did not ask him for rent payment when he signed the May 2010 Lease. Tenant claimed that he did not remember ever telling any of Landlord's agents that he was going to send Landlord the 2010 rent payment. He also testified about the cleanup work to improve Oyster Farm over several years for which he was never compensated. On cross-examination, Tenant stated that he received compensation in 2010 for crop insurance, and also received payment under another federal farm program that same year.

The trial court also had a number of questions that it asked Tenant. Tenant again stated that he had crop insurance in 2010, and that he was in possession of Oyster Farm for all of 2010. He claimed that when he signed the May 2010 Lease that he had not paid any rent for 2010 and he expected not to pay any rent in 2010, though he also stated that it was his intention to actually farm Oyster Farm in 2010. Under questioning by Landlord's counsel, Tenant admitted that as of May 3, 2010, he did not know whether he was going to be able to plant crops in May or June of 2010, but that he was "an optimist." This resulted in the following exchange:

> Landlord's counsel: So why on earth would you think you're going to get a free year's worth of rent when you got two months to plant the farm?
>
> Tenant: But I couldn't plant the farm.
>
> Landlord's counsel: Well, you didn't know that that on May 3, did you?
>
> Tenant: No, I did not.

The trial court issued its judgment on December 28, 2012. It entered judgment in favor of Landlord on its claim for breach of contract in the amount of $51,100 as cash rent for Oyster Farm. It found in favor of Tenant on his counterclaim for quantum meruit for services provided in the amount of $14,135. The trial court offset the two damage awards, and entered final judgment in favor of Landlord and against Tenant in the amount of $36,965. Tenant now appeals.

In his sole point relied on Tenant contends that the trial court erred in entering judgment against him in the amount of $51,100 for rent for 2010 because the trial court looked beyond the lease itself to determine the rent payment due date. Alternatively, Tenant asserts that if the May 2010 Lease were ambiguous, then the trial court failed to "interpret the lease against the drafter's interest, in that the lease contained plain and consistent information to calculate the rental payment dates as April 1, 2011 and April 1, 2012 without the need for extraneous evidence," where Landlord's agent drafted the May 2010 Lease.

■ In a bench-tried case, the trial court's judgment will be sustained unless it is not supported by substantial evidence, is against the weight of the evidence, or erroneously declares or misapplies the law. *Murphy v. Carron*, 536 S.W.2d 30, 32 (Mo. banc 1976).

■ This Court reviews the language of a lease *de novo* in order to determine the parties' intent. *Brittany Sobery Family Ltd. Partnership v. Coinmach Corp.*, 392 S.W.3d 46, 50 (Mo.App.2013). When interpreting leases, this Court applies the rules of construction governing contracts. *Id.* First we examine the plain and ordinary meaning of the language used in the lease to determine if it clearly addresses the disputed matter. *Id.* An

ambiguity must come from within the four corners of the contract; it cannot be created by the use of extrinsic, or parol, evidence. *ATC Co., Inc. v. Myatt*, 389 S.W.3d 732, 735 (Mo.App.2013). The parol evidence rule is a substantive rule of law and not a rule of evidence. *See Missouri Department of Transportation ex rel. PR Developers, Inc. v. Safeco Insurance Company of America*, 97 S.W.3d 21, 32 (Mo. App.2002). The parol evidence rule does not prevent the admission of relevant evidence, but rather prohibits the trier of fact from using such evidence to contradict, vary, or alter the terms of an integrated written contract. *Id.* (quoting *State ex rel. Missouri Highway and Transportation Commission v. Maryville Land Partnership*, 62 S.W.3d 485, 489 (Mo.App.2001)). However, if the language of a lease is ambiguous, courts will look to the language in the context of the entire lease and parol evidence to ascertain the parties' intent. *Coinmach*, 392 S.W.3d at 50. A contract is ambiguous or unclear if its language is reasonably susceptible to more than one interpretation giving the words their plain and ordinary meaning as understood by the average, reasonable person. *Id.* Once an ambiguity is determined to exist, the parties' intent can be ascertained through the use of extrinsic evidence. *ATC Co.*, 389 S.W.3d at 735–36. Resolution of an ambiguity through the use of extrinsic evidence is a question of fact. *Id.* at 736. Only where there is no evidence showing the intent of the parties will we construe an ambiguity against the party who drafted it. *Id.* If the contract is not an adhesion contract, this Court will construe the contract against the drafting party as a last resort, and only if there is no evidence of the parties' intent. *Id.* at 737.

At first glance the May 2010 Lease would appear to be unambiguous about the date of cash rent payment. It provides that "The cash rent shall be paid each year in the following method: By April 1 of

each year of the contract." However, the opening paragraph of the May 2010 Lease states that:

> This lease is entered into May 3, 2010 between CENTRAL STONE COMPANY, Lessors at 46445 Sweetbay Lane, Hannibal, MO 63401 and DANIEL WARNING, Lessee at 32351 280th St., LaGrange MO 63448.

It also provided that the term of the lease was from January 1, 2010 to December 31, 2012.

■ Tenant argues that there is no ambiguity. We disagree. Looking within the four corners of the May 2010 Lease, it is readily apparent that there is an inherent ambiguity regarding when the cash rent is to paid for the first year of the lease. The plain and ordinary language states that it is due on April 1 of each year of the May 2010 Lease, but the agreement was entered into on May 3, 2010, and it was to be effective from January 1, 2010. A payment date before the execution of the contract is an impossibility. Hence there is some ambiguity about when the cash rental for 2010 was due. The most likely payment date would be when the lease was executed, given that the payment date was April 1, 2010, as the first available date for it to be due would be May 3, 2010.[2] Alternatively, it is also a reasonable interpretation that rent for 2010 was due on December 31, 2010. At common law in Missouri, in the absence of any agreement between the landlord and

the tenant as to when rent is due and payable, it is payable at the end of the year. *See Bashor v. Turpin,* 506 S.W.2d 412, 421 (Mo.1974); *Ridgley v. Stillwell,* 27 Mo. 128 (1858); *Ostner v. Lynn,* 57 Mo. App. 187 (1894). The trial court did not err in considering evidence extrinsic to the May 2010 Lease regarding the issue of when the cash rent was due for 2010.[3]

■ Testimony at trial indicated that the intent of the parties was that the cash rent payment for 2010 was due at the time of execution of the May 2010 Lease. Sivill stated that it was a management decision not to ask Tenant for the rent at the time of execution of the lease. Harsell testified that Tenant repeatedly indicated throughout 2010 that he owed Landlord the cash rent for Oyster Farm and needed to send Landlord a check. The trial court did not make a finding of fact on this issue, and it would not affect the outcome if the trial court had found that the cash rent was not due until the end of the year. Whether the rent for 2010 was due on May 3, 2010 or on December 31, 2010, Tenant had not paid it as of April 13, 2011.

■ Tenant argues in the alternative that the trial court erred in failing to construe the ambiguity in the May 2010 Lease against the interest of the drafter, Landlord, and interpret from the language of the May 2010 Lease that no rent was due for 2010. Assuming *arguendo* that the May 2010 Lease was an adhesion con-

---

2. Drafters of leases wherein the effective date and the specified date for annual payment are prior to the actual execution date of the lease could resolve the issue of the timing of the first lease payment by including a clause that specifies that the initial payment is due upon execution of the lease or some specific date thereafter. Such a specific contractual provision avoids ambiguity and/or defaulting to the common law regarding leases.

3. Tenant's interpretation that no rent was due for 2010 because the payment date for that

year was April 1, 2010, is unreasonable. Tenant was in possession of Oyster Farm from January 1, 2010 through December 31, 2010. He did some preparation to farm the property. As of May 3, 2010, when Tenant and Landlord executed the May 2010 Lease, he still planned to farm it. While he did not, in fact, plant crops on Oyster Farm in 2010, under his interpretation of the May 2010 Lease he still would not have owed rent even if he had successfully farmed the land.

tract, the trial court did not err.[4] Even with an adhesion contract, the courts, as with all contracts,

> ... seek to enforce the reasonable expectations of the parties garnered not only from the words of a standardized form imposed by its proponent, but from the totality of the circumstances surrounding the transaction. Only such provisions of the standardized form which fail to comport with such reasonable expectations and which are unexpected and unconscionably unfair are held to be unenforceable. Because standardized contracts address the mass of users, the test for "reasonable expectations" is objective, addressed to the average member of the public who accepts such a contract, not the subjective expectations of an individual adherent.

*Hartland Computer Leasing Corp., Inc. v. Insurance Man, Inc.,* 770 S.W.2d 525, 527 (Mo.App.1989) (internal citations omitted). In the present case, the trial court could have found, at best, that the cash rent was due at the end of the year, as it had been under the prior lease and as it would have been under common law. Such a finding would not have changed the judgment of the trial court that awarded Landlord $51,100 for nonpayment of rent under the May 2010 Lease. Point denied.

The judgment of the trial court is affirmed.

ROBERT M. CLAYTON, III, C.J., and GARY M. GAERTNER, JR., J., concur.

---

4. While the May 2010 Lease was based on a standardized lease form used by Landlord, it had been customized somewhat for Tenant. The evidence at trial suggests that the terms of the May 2010 Lease had been the subject of negotiations rather than presented to Tenant on a take it or leave it basis that is the essence of an adhesion contract. In early 2010 Tenant approached Landlord about extending the lease for Oyster Farm, due to terminate in 2010. Sivill told him that if he wanted to extend the lease, rent would have to be raised and the extension would be for another three years. The parties agreed to these terms.