Steve Alan **MARTIN** and Leslie Robert Benson, Respondents,

v.

**PRIER BRASS MANUFACTURING CO., Appellant.**

No. WD 36587.

Missouri Court of Appeals, Western District.

May 13, 1986.

Thomas H. Stahl and Kristin L. Farnen, Gunn, Hall & Stahl, Gladstone, for appellant.

Roland V. Heckman, Kansas City, for respondents.

Before SHANGLER, P.J., and TURNAGE and BERREY, JJ.

SHANGLER, Presiding Judge.

The plaintiffs Martin and Benson, employees of Prier Brass Manufacturing Company, each brought a separate suit against Prier Brass to recover major medical benefits under a plan of insurance sponsored and underwritten by the employer company. The suits were consolidated for trial, adjudicated by the court in favor of each plaintiff, and as consolidated appealed by the employer.

Prier Brass sponsored health insurance programs for its employees. One, a red book health care plan, was for hourly rated employees. The other, a gold book health care plan, was for salaried employees. They were both noncontributory.[1] The red book plan required four years of service for an employee to be eligible for major medical benefits. The gold book plan required only six months of service[2] for an employee to be eligible for major medical benefits. Martin and Benson were both salaried, employed for more than six months, and hence covered under the gold book plan. Neither of them had worked at Prier Brass for four years—and hence, neither would have qualified for major medical benefits under the employment terms of the red book plan.

In the summer of 1983 Prier Brass was beset by financial concerns and undertook to reevaluate the health plans then extant. The president of the company, Hodes, appointed three of the company personnel as a committee for that purpose: Benson, comptroller [and a plaintiff here], Turek, labor relations supervisor, and Marshall, chief engineer. That effort culminated in the decision to modify the subsistent health plans so that all coverage would be administered according to the terms of the red book plan.[3] To qualify for major medical benefits—[drugs and medicines under written prescriptions were deemed major medical benefits under the red book]—four years of employment service was required. Neither of the plaintiffs, Martin or Benson [as we note], had worked at Prier Brass for four years.

It was the Benson testimony that, although a member of the revision committee, he never knew of a decision to substitute the red book for the gold book as the health care plan for salaried employees, nor of any notice from Prier Brass that the company had put such a plan into effect. It was the Martin testimony that although there were rumors of a change, he neither knew nor was given notice that the red

1. There was evidence that at the outset of employment, the Prier Brass personnel manager informed a new employee that medical benefits coverage was an emolument of employment, and provided the new employee with a copy of the plan pertinent to the employment—[a red book to an hourly employee, and a gold book to a salaried employee]. The preface of the form distributed by Prier Brass to employees Martin and Benson [and the others eligible under one plan or the other, we assume] declares:

   We are pleased to inform you that you will soon be eligible for coverage under our group insurance plan with PRIER BRASS MANUFACTURING COMPANY. We are glad to be able to provide this broad coverage policy, cost free to you in appreciation of your cooperation and loyalty. Prier Brass pays the entire premium and all premium increases.

2. The gold plan book actually covered *two* categories of employees. Salaried employees [Martin, for instance] and hourly-paid supervisors [Benson, for instance]. In the case of an hourly-paid supervisor, 1,040 hours of service [virtually six months] was required to be eligible for major medical benefits.

3. Benson, a member of the committee, gave testimony that the group investigated a number of plans, but came to no decision. Committee member Marshall was ill and away from work from June 1, 1983 until July 15, 1983, but recalled the decision to consolidate all employees under the red book plan. Turek testified that the three had joined in the decision to change the coverage so that all the personnel, salaried as well as those hourly rated, would be covered under the red book plan. Whatever the range of the consensus for the red book plan among the committee, there is no doubt that on August 16, 1983, Prier Brass undertook to administer the health care claims of insured employees under the terms of the red book.

book was the health plan in effect for all employees until September of 1983, when he presented a major medical expense bill to Turek for payment. It was the Turek testimony that a notice of the change to the red book plan for all employees, dated August 16, 1983, was posted on the bulletin board and a copy of the notice was placed in the mail baskets of those employees with such an amenity.

The wife of plaintiff Martin [then also a Prier Brass employee] was delivered of a child in July of 1983. The expenses of that event [$3,180.77] were covered under the gold book, remain unpaid, but are not in dispute. Thereafter, on August 24, 1983, a gall bladder surgery on Mrs. Martin incurred the cost of $6,168.12, an expense which would have been payable as a major medical benefit under the gold book. The coverage under the red book was $2,091.65, since Martin was not employed for the four years which qualified an employee for major medical coverage under the red book. Prier Brass tendered the red book benefit —$2,091.65—but Martin insists that the major medical coverage of the gold book appertains.

Benson incurred medical costs after August 16, 1983. Trial counsel stipulated that the benefits payable under the gold book were $2,691.00 and under the red book were $355.48.

The trial court posed as the issue for decision:

Whether plaintiff Martin and plaintiff Benson received notice of the change in the plan prior to the date each incurred medical expenses for the recovery of which these suits have been brought.

The court entered a memorandum and order and, after determination of the facts deemed essential to decision, entered a separate judgment for each—Martin and Benson—under the coverage of the gold book plan. The memorandum expresses as the premise of fact essential for judgment that the health insurance coverage was a part of the compensation of employment given each employee—and, presumably, for a salaried worker in continuous employment for six months at Prier Brass—coverage under the gold book plan. The memorandum expresses as the premises of law essential for judgment (1) that the employer could not reduce the health care coverage to an affected employee without a prior notice to the employee of the change, or the shown acquiescence of the employee, and (2) that the burden to prove that an affected employee knew of the change rested on the employer—a burden the Prier Brass evidence failed to acquit.

Prier Brass contends, nevertheless, that the health care coverage the red and gold books provide an employee is an actual group insurance policy, and hence under settled principles, the burden rests on the *employee* to prove coverage at the time the medical expenses were incurred. Prier Brass argues, accordingly, that a premise of law essential to decision was erroneous and the judgment may not stand.

The term *group policy* describes, typically, a contract of insurance whereby persons, usually employees of a business enterprise, are insured in consideration of a determined payment per period, so long as the persons remain in employment and the premiums are paid. *Legler v. Meriwether*, 391 S.W.2d 599, 602[3, 4] (Mo.App.1965). The employer, in such an insurance arrangement, holds the master policy from the insurer, and each employee-participant holds a certificate as evidence of the coverage. The group may vary according to the flux of employees, and the policy drawn to cover the numerous, but undesignated, persons enrolled as employees. In such a usual group policy arrangement, the employer is typically the recordkeeper for the insurer, as well as the remitter of the premiums. Appelman, *Insurance Law and Practice* § 41, at 83 (1981); *White v. Prudential Insurance Co. of America*, 235 Mo.App. 156, 127 S.W.2d 98, 99 (1939). The health insurance coverage Prier Brass tendered through the red book plan and the gold book plan was not to employees indeterminate as to numbers or names. Nor was the employer the recordkeeper for the insurer, as in the usual group policy. The

employer was the insurer as well as the record keeper, and knew the names and employment status of the person covered at any given time—and that [prior to August 16, 1983], whether under the red book plan or the gold book plan.

■ The coverage Prier Brass held out to an employee, rather, was a "cost free" emolument of employment, "in appreciation of [the] cooperation and loyalty" of the particular employee, consummated by the performance of conditions: in the case of a salaried employee or hourly-paid supervisors [Martin and Benson], a completed six months employment, and thereafter continued employment. Thus, the Prier Brass gold book plan performance was the *quid pro quo* for the Martin and Benson employment performances. This transaction between Prier Brass and employee describes a bilateral contract—a bilateral contract of insurance, and not a contract of group insurance—and hence is governed by principles of bilateral contract, and not of a group insurance contract. *Transport Indemnity Co. v. Teter*, 575 S.W.2d 780, 784[1–3] (Mo.App.1978); *Bengimina v. Allen*, 375 S.W.2d 199, 202[1] (Mo.App.1964).

■ The law fixes upon a plaintiff the burden to prove a cause of action on an insurance policy, as in any other case. *Piva v. General American Life Insurance Co.*, 647 S.W.2d 866, 869[1–4] (Mo.App. 1983); *State Farm Mutual Automobile Insurance v. St. Louis County*, 601 S.W.2d 291, 294[n. 1] (Mo.App.1980). That risk of nonpersuasion attends the proof of the case, and does not vary, whether the contract of insurance is in the form of a group policy or a bilateral policy. *Morris v. Travelers Insurance Co.*, 546 S.W.2d 477, 481 (Mo.App.1976); *Stogsdill v. General American Life Insurance Co.*, 541 S.W.2d 696, 699 (Mo.App.1976).[4] A claimant under a contract of insurance discharges the substantive risk of nonpersuasion by evidence that the loss comes within the coverage of the policy. *Missouri Commercial Investment Co. v. Employers Mutual Casualty Co.*, 680 S.W.2d 397, 400[2] (Mo.App.1984); *White v. Prudential Insurance Co. of America*, 127 S.W.2d at 102[1–3]; Couch on Insurance 2d § 79:345 (1983).

A policy of insurance, as any other written contract, is given effect according to its terms. *Transport Indemnity Co. v. Teter*, 575 S.W.2d at 784[1–3]. In terms of contract coverage, there was no dispute that the gold book plan as written encompassed the Martin and Benson claims. Prier Brass acknowledges by stipulation—and hence concedes—that the $6,168.12 cost of the Martin gall bladder surgery on August 24, 1983 and the Benson medical costs incurred after August 16, 1983 were expenses covered by the terms of the gold book *if* that plan continued to subsist on those dates.

---

**4.** The briefs intimate the misconception that in certain cases to recover under a policy of insurance—[which, according to plaintiff Martin and Benson appertains to their claims, and which, according to defendant Prier Brass, does not]—the burden to prove that noncoverage of the plaintiff rests upon the defendant—so that the plaintiff is relieved of the risk of nonpersuasion of that essential proof. These arguments advert to *Gibson v. Texas Prudential Ins. Co.*, 229 Mo. App. 867, 86 S.W.2d 400 (1935). That case holds, as do the many others decided by our courts, that the production of the policy and the proof of death makes out a prima facie case of the beneficiary under a life insurance policy. That case decides only that such proof adduced, the burden to go forward with the evidence that the policy lapsed for nonpayment of premiums rests with the insurer. And that on the consideration of practical necessity [at 404] "the insured being dead, all the information with reference to the payment or nonpayment of premiums is in the sole possession of the insurance company, therefore plaintiff is aided by a presumption that the policy continued in force through the payment of premiums by the insured until his death, and that the defendant, being in possession of the facts, is in a position to overcome this presumption by evidence." *See also White v. Prudential Ins. Co. of America*, 235 Mo.App. 156, 127 S.W.2d 98, 102[4] (1939).

Thus, *Gibson* as well as the other decisions of that ilk, declares the general rule that the burden to prove a death benefit under a life policy rests on the claimant. It declares as well, consonant with the general rule, that a prima facie case shown, the claimant has acquitted the substantive burden of proof and the burden to go forward with the evidence to defeat the claim—on whatever ground—then shifts to the insurer.

Thus, the question posed to the trial court was not whether the express terms and conditions for recovery under the gold book were proven, but whether that plan was already validly terminated by Prier Brass under the terms of that contract, at the time the Martin and Benson claims accrued. Prier Brass gave evidence that a notice dated August 16, 1983 was posted on the bulletin board and distributed into employee mail baskets that the administration of all health care claims would be under the red book. The trial court determined that, under the evidence, the health insurance benefit was "a part of each employee's employment compensation," and so was an emolument which could not be discontinued without prior notice given or the acquiescence of the employee. The trial court concluded as a corollary of law, that the burden to prove notice to an affected employee rested on Prier Brass, and determined, as a fact, that the employer failed that proof.

■ Prier Brass reverts to the analogy of the group policy to argue that, under our decisions, where the terms of the policy do not provide for notice, the insurer owes no duty of notice to an employee-participant to cancel the policy. That doctrine was once definite as to a *noncontributory* group insurance policy. It rested on the analysis that a group policy to insure the health of employees of an enterprise was a contract between the insurer and the employer as the insured for the benefit of the employees. The rationale of analysis was that in the circumstance of a *noncontributory* insurance contract, the employee was not in privity with the insurer, but was merely the third-party beneficiary of the contract, and hence "no rights of [the] employee are affected by a cancellation [and] there can be no reason for such notice." *Satz v. Prudential Insurance Co. of America*, 225 S.W.2d 480 at 483[3] (Mo. App.1949). *See also Brown v. Equitable Life Assurance Society of United States*, 143 S.W.2d 343, 346[1–4] (Mo.App.1940); *White v. Prudential Insurance Co. of America*, 127 S.W.2d at 102[1–3]. That rationale did not bear even under the group policy analogy, however, where the coverage issued for a *quid pro quo*. In such a case the obligation of the employee-participant to perform in exchange for the coverage entitles the employee to expect that the employer and insurer will continue the promise to perform, and to notify the employee prior to termination of the coverage performance. *Nick v. Travelers Insurance Co.*, 238 Mo.App. 1181, 185 S.W.2d 326 (1945), *aff'd* 354 Mo. 376, 189 S.W.2d 532, 535; *Morris v. Travelers Insurance Co.*, 546 S.W.2d 477, 483 et seq. (Mo.App. 1976); *Butler v. Equitable Life Assurance Society*, 233 Mo.App. 94, 93 S.W.2d 1019, 1023 et seq. (1936). The employee under such a scheme of insurance becomes a direct party to the promise for coverage, thus owns an expectation the law protects, and is entitled to notice from the other party that the promise to give coverage is terminated. Thus, such an employee is entitled to notice in such circumstances, if for no other reason than to "seasonably obtain similar insurance protection on his own account elsewhere." *Nick v. Travelers Insurance Co.*, 189 S.W.2d at 535.

■ The distinction between a contributory and noncontributory group policy— and hence privity or nonprivity of contract between the insurer and the employee—already tenuous in our evolved decisions, was altogether effaced by our supreme court en banc in *Bellamy v. Pacific Mutual Life Insurance Co.*, 651 S.W.2d 490 at 496[5] (Mo. banc 1983):

> Furthermore, the Fricks' [employers'] payment [of the premium] on Nancy's [employee's] behalf was a fringe benefit that substituted for salary, so the effect was the same if Nancy received as salary the amount of the premium and paid it directly to the insurer.

Thus, the very benefit an employer derives from the services of an employee suffices as consideration by the employee to the insurer for the coverage in a plan of *noncontributory* group insurance. In a word, the very employment service is the *quid pro quo* between the insurer and employ-

ee—albeit transmuted as the payment of a money premium by the employer to the insurer.

The insurance coverage Martin and Benson each claims is not, in any event, as the third-party beneficiary under a noncontributory group policy, but as the direct promisee of Prier Brass, given in exchange for the employment performance, to provide the benefits prescribed under the gold book plan. On contract principle, therefore, the promise of coverage to Martin and Benson while employment performance continued is an expectation the law protects. Restatement (Second) of the Law of Contracts §§ 71 *et seq.* (1981). It is an expectation, moreover, the law enforces unless, of course, the expectation was terminated or was no longer due under the terms of the contract.

The gold book plan states four contingencies for termination of coverage to an eligible employee: (1) cessation of employment (2) entry into the armed services on active duty (3) notice by the *employee* that coverage is to be terminated and (4) *the date the Plan is terminated.* Thus, the coverage may terminate at the initiative of the employee [grounds (1), (2), or (3) ] or of the employer [ground (4) ]. The employer, under this scheme, is given actual notice by the employee or virtual notice from events which, by the nature of the relationship, come to the knowledge of the employer, before the initiative of the employee to terminate the coverage binds the employer. The plan imposes no duty of notice upon Prier Brass to the employee to an effective termination of the coverage. The Plan merely terminates *the date the Plan is terminated.*[5]

The Plan also reposes in the sponsor the prerogative to construe the terms and to accord them conclusive meaning:

> We have the authority to construe the Plan and to determine all questions that

arise under it. Our interpretation is binding on all employees, retired employees and dependents, and their beneficiaries.

■ The Plan also provides for formal amendment "as we deem proper." Prier Brass argues that the provision in the Plan that the benefits to an employee automatically terminate upon cancellation of the Plan [by Prier Brass] and the want of provision for notice to the employee prior to termination invests the right of contract to terminate without notice to the employee. Prier Brass asserts, once again, the analogy of the *noncontributory* group insurance policy and on decisions of the *Satz v. Prudential Insurance Co. of America* ilk, since discredited. The promise of coverage, we iterate, was directly from Prier Brass to Martin and Benson, and given as the *quid pro quo* of employment, and not from an insurer to an employer for the benefit of the employees as in the analogy Prier Brass proffers. The right to the benefits under the contract of each, Martin and Benson, with Prier Brass, therefore, vested to the extent that the employment performance was completed and continued to be given. *Cannon v. Katz Drug Co.,* 577 S.W.2d 82, 87[1] (Mo.App.1978); *Nick v. Travelers Insurance Co.; Butler v. Equitable Life Assurance Society,* 93 S.W.2d at 1023–1024. It was a right, cognately, which could be affected only to the extent the contract remained executory and unperformed by the employee—but, only upon notice that the benefit still unaccrued was terminated. *Cannon v. Katz Drug Co.,* 577 S.W.2d at 87[1].

■ The authority the Plan invests in Prier Brass [or its surrogate] to impose upon a beneficiary a meaning of terms—contrary to the sense of argument—cannot operate to give validity to invalidity or to evade the duty of good faith the law impos-

---

**5.** On the record before us there would appear to be no palpable advantage to an employee to discontinue the coverage while still in the employ of Prier Brass [ground (3) ]. The gold book plan, the application by the employee for coverage, and the other accoutrements of that incident of employment were all designed by employer Brass. We assume therefore that the requirement that an employee give notice prior to termination of coverage under the plan, however it may work to the disadvantage of the employee, works an advantage to the employer.

es on the parties in the performance and enforcement of a contract. To construe the Plan, as does Prier Brass, to empower the employer to terminate the benefits of an employee-promisee at will and without notice, is to invent a term which lacks mutuality of obligation, is illusory, and unenforceable. *Cooper v. Jensen,* 448 S.W.2d 308, 314[12] (Mo.App.1969). 1A Corbin on Contracts § 163 (1963) states the principle:

> If a promisor reserves the power to cancel at any time without notice, his promise seems to be unenforceable, at least as long as there has been no performance by the other party to the agreement. While still wholly executory, the promisor is not bound for the reason that he can cancel without notice by merely willing to do so; and the other party's promise is not binding for lack of consideration.

*See also* 17 C.J.S. *Contracts* § 100(6) (1963).

Prier Brass, moreover, was bound to exercise the power conferred by the contract as interpreter of the terms an arbiter of "all questions that arise under [the Plan]" in good faith. It will not do, as Prier Brass intimates in argument, to bind Martin and Benson to a construction of the contract that allows the employer to cancel the benefits to employees under the Plan, and to do so without prior notice, merely because Prier Brass reads the contract to that effect. It is a fundamental principle and concomitant of agreements that: "Every contract imposes upon each party a duty of good faith and fair dealing in its performance and enforcement." Restatement (Second) of Contracts § 205 (1981). That duty prevents one party to the contract to exercise a judgment conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract. 1A Corbin on Contracts § 165 (1963); Summers, *The General Duty of Good Faith—Its Recognition and Conceptualization,* 67 Cornell L.Rev. 810, 821 et seq. (1982). The express Plan empowered Prier Brass as the exclusive determinant of the benefits due the employees—Martin and Benson—under the contract. To deny them those expectations without notice merely because Prier Brass reads that notice is not due, not only impairs rights already vested, but also the contract duty of good faith.

Prier Brass argues, alternatively, that if notice was required, notice was given. Whether notice of termination of contract benefits was given is an issue of fact. *Cannon v. Katz Drug Co.,* 577 S.W.2d at 87[2]. There was evidence by Prier Brass labor relations supervisor Turek that a notice of the termination of the gold book plan was posted on the bulletin board and a copy placed in the mail basket of every salaried employee. Martin and Benson testified they never saw such a notice, nor were they informed of the notice, nor did they know that the Plan had been changed at the time they incurred the expenses. The trial court determined that the burden to prove the fact of notice was on Prier Brass, and that the burden simply was not met as to that issue. Prier Brass does not contend that the allocation of the burden to the employer *on that issue* was an error of law, but only that the allocation of the burden of proof to the employer on the substantive cause of action was error—and that, in any event, notice to Martin and Benson was conclusively proven. Our discussion dispels the contention that the adjudication rests on the allocation of the risk of nonpersuasion on Prier Brass and the failure to overcome that risk. Our opinion determines, rather, that Martin and Benson as plaintiffs bore the burden on the substantive cause of action, proved a prima facie case, and hence met that onus. Prier Brass does not complain that the allocation to the employer-insurer as defendant of the burden of proof on the issue of notice was an error of law. Our cases hold, indeed, that the proof of a prima facie case that the loss comes within the coverage of the policy, shifts to the insurer the burden to show an excuse for nonpayment. *Thrower v. Life & Casualty Insurance Co. of Tennessee,* 141 S.W.2d 192, 195[2, 3] (Mo.App.

1940); *Mitchell v. Washington Fidelity National Insurance Co.*, 81 S.W.2d 377, 378[1, 2] (Mo.App.1935); *Godfrey v. St. Paul Fire & Marine Insurance Co.*, 232 S.W. 231[1] (Mo.App.1921).

The allocation of the onus on the insurer-employer to prove the issue of notice, moreover, was a practical necessity under the circumstances. The gold book empowers Prier Brass [through its surrogate] to terminate benefits altogether, but does not prescribe by what method. The gold book omits altogether any mention of notice. Thus, the method used by Prier Brass to exercise the initiative given by the Plan to terminate the benefits to the employees, and the means of notice to the employees, if notice was undertaken, is information peculiarly known to Prier Brass. The evidence reasonably available to Martin and Benson was whether or not they received notice, and not whether or not Prier Brass gave any. It was the insurer-employer, therefore, who had access to the proof to adduce why payment of the expenditures incurred by Martin and Benson, concededly covered if the policy continued in effect, should be excused because of a prior termination. *Gibson v. Texas Prudential Insurance Co.*, 229 Mo.App. 867, 86 S.W.2d 400, 404 (1935); *White v. Prudential Insurance Co. of America*, 235 Mo.App. 156, 127 S.W.2d 98, 103 (1939). McCormick, *On Evidence*, § 336 The Burdens of Proof: The Burden of Producing Evidence and the Burden of Persuasion (3d ed. 1984).

The coverage under the policy was stipulated, and what remained for trial and adjudication was the issue of notice by Prier Brass to Martin and Benson that the gold book plan was terminated before their expenses under a coverage, still subsistent, accrued. Prier Brass complains that the judgments given for Martin and Benson were in error because the evidence conclusively proved notice. That is not tenable. The determinations of fact that notice was not given rests on substantial evidence.

It was a stipulation between Prier Brass and Martin and Benson that the expenditures payable under the gold book plan, if still in effect as to them at the time the major medical expenditures of each was incurred, was $9,348.89 as to Martin and *$2,691.00* as to Benson. The court entered judgment of $9,348.89 in favor of Martin [as per stipulation], but entered a judgment of *$3,691.00* as to Benson [contrary to stipulation]. The memorandum and order does not find or disclose the evidence on which the judgment to Benson rests, and, indeed, there is none. The judgment in favor of Benson is modified to conform with the undisputed evidence, that the expenditures covered under the gold book plan amounted to $2,691.00.

The judgment in favor of Martin is affirmed. The judgment in favor of Benson is modified, and as modified, is affirmed.

All concur.