24CA2040 Kwesell v LSL Management 11-26-2025

COLORADO COURT OF APPEALS

Court of Appeals No. 24CA2040
El Paso County District Court No. 23CV30085
Honorable Eric Bentley, Judge

Richard Kwesell; Michael Kwesell; and KBG, LLC, a Colorado limited liability company,

Plaintiffs-Appellees,

v.

LSL Management, LLC, a Missouri limited liability company,

Defendant-Appellant.

JUDGMENT AFFIRMED AND CASE
REMANDED WITH DIRECTIONS

Division III
Opinion by JUDGE DUNN
Lipinsky and Kuhn, JJ., concur

**NOT PUBLISHED PURSUANT TO C.A.R. 35(e)**
Announced November 26, 2025

Mulliken Weiner Berg & Jolivet P.C., Murray I. Weiner, Erin Leach, Colorado Springs, Colorado, for Plaintiffs-Appellees

Spencer Fane LLP, Jacob F. Hollars, Jose A. Castro, Denver, Colorado; McCarthy, Leonard & Kaemmerer, L.C., S. Jay Dobbs, Michael P. Herrmann, Chesterfield, Missouri, for Defendant-Appellant

¶ 1     Defendant, LSL Management, LLC, appeals the judgment entered in favor of plaintiffs, Michael Kwesell; Richard Kwesell; and KBG, LLC, following a bench trial on the parties' competing breach of contract claims. We refer to the Kwesells and KBG collectively as plaintiffs unless a distinction is required.

¶ 2     LSL contends that the district court erred by (1) finding it failed to comply with the contracts' termination provisions; (2) finding that plaintiffs substantially performed under the contracts; and (3) miscalculating the damages awarded to plaintiffs. Because we disagree with these contentions, we don't reach LSL's final contention — that the court erred by finding that LSL had not proved damages. We affirm the judgment.

## I.     Background

### A.     The Parties

¶ 3     Brothers Michael and Richard Kwesell co-founded and co-own KBG, a Colorado cannabis business. KBG is a vertically integrated business that includes cultivation, manufacturing, and retail operations.

¶ 4     In 2018, Missouri legalized the cultivation and sale of medical marijuana. Soon after, Andrew Lammert, Brandt Stiles, and Kyle

Lenzen formed LSL to develop a Missouri cannabis business. LSL representatives later traveled to Colorado, met with the Kwesells, and toured KBG's facilities. LSL expressed an interest in a consulting relationship with plaintiffs to help LSL develop its cannabis operations.

## B. The Contracts

¶ 5 In July 2019, LSL and KBG entered into a management agreement under which plaintiffs agreed to provide, among other things, consulting and business management services to LSL. The Kwesell brothers each signed a separate management agreement obligating them to support the KBG-LSL management agreement. Because all three agreements are substantially similar and have identical termination and notice provisions, we refer to them collectively as the contracts.

¶ 6 Under the contracts, which are governed by Missouri law, plaintiffs agreed to provide services in three main areas: cultivation, extraction, and retail operations. The specific scope of services is outlined in a schedule attached to the contracts. In exchange for these services, LSL agreed to compensate plaintiffs through a combination of fees and a percentage of gross monthly sales.

## C.    Deterioration of the Parties' Relationship

¶ 7    The first couple of years of the relationship went much as expected.  But challenges for plaintiffs and LSL began developing roughly in early 2022.  Plaintiffs faced financial challenges in their Colorado operations as decreasing demand and oversupply led to a decline in marijuana prices.  These financial problems led to significant KBG employee layoffs, including the layoff of Samuel Thoman, who was a key manager under the contracts with responsibilities for providing services to LSL.

¶ 8    Around the same time, LSL faced problems with its greenhouse, including humidity control issues that led to crop loss.  After Thoman was laid off in June 2022, he quickly accepted a position with LSL.  Soon after starting work at LSL, Thoman fixed the greenhouse humidity problem.  Thoman also reported to LSL that, while employed by KBG, he prioritized his responsibilities to KBG over his obligations to LSL.

¶ 9    By July 2022, LSL viewed the contracts as "totally breached" and began to prepare a calculation of lost profit damages and a "demand letter."  LSL, however, did not notify plaintiffs at that time

that it considered the contracts breached or ask plaintiffs to cure any identified breach.

### D. Notices of Material Breach and Termination

¶ 10 In August 2022, the parties had a phone call to discuss the contracts and whether they should renegotiate any portions of them. The parties also disputed responsibility for LSL's crop loss and ultimately agreed to talk further.

¶ 11 Three months later, LSL sent plaintiffs three letters captioned "Notice of Material Breach," one for each contract. The notices detailed a myriad of alleged general breaches, including, for example, failures to manage and train, which LSL claimed resulted in "catastrophic monetary damages." The notices advised plaintiffs that they could cure the alleged breaches by (1) paying $9,084,290 in damages and (2) replacing "all the [k]ey [m]anagers [who had been laid off] with personnel of the same skill and experience." The notices threatened that, if payment was "not made within sixty (60) days," LSL would be "forced to pursue its full legal remedies," including termination of the contracts. The notices, however, didn't say anything about the length of the cure period to hire new

employees or ask KBG to perform any specific services under the contracts.

¶ 12    Plaintiffs responded in writing that they "ha[d] always performed, and w[ould] continue to perform, [their] obligations under the respective [contracts]."

¶ 13    After the sixty-day cure period expired, LSL sent three letters captioned "Termination Notice," terminating each contract.

### E.    The Litigation

¶ 14    Plaintiffs then filed this action against LSL, asserting three breach of contract claims, one for each contract.  LSL counterclaimed, asserting three competing breach of contract claims.

¶ 15    After a four-day bench trial that included conflicting testimony and over one hundred exhibits, the district court issued a detailed written order with its findings of fact and conclusions of law.

¶ 16    The court found that each party breached the contracts, entered judgment in favor of LSL on plaintiffs' claims, entered judgment in favor of plaintiffs on LSL's counterclaims, found neither party was the prevailing party under the contractual fee-shifting provisions, and awarded no damages.

## F.    Post-Trial Motions

¶ 17    Plaintiffs filed a motion to amend the findings and judgment under C.R.C.P. 59, arguing that because LSL "did not comply with its contractual obligations of notice and a meaningful opportunity to cure, LSL did not properly terminate the [c]ontracts and they remain[ed] in effect through the end of their terms."

¶ 18    The district court granted the motion, concluding that it had "erred in its interpretation of the contractual language" and that this error compelled a "substantial amendment of [its] findings and judgment."  In its order, the court found that plaintiffs' nonperformance in 2022 "entitled LSL to give notice, provide a reasonable opportunity to cure, and to then terminate the [c]ontracts for cause if the circumstances remained uncured." Because it found that LSL "failed to provide [p]laintiffs a reasonable opportunity to cure," the court concluded that plaintiffs had not breached the contracts.  Rather, by failing to comply with the notice and cure provisions, the court found that LSL breached the contracts by declaring them terminated.

¶ 19    The court issued written amended findings of fact and conclusions of law, entering judgment in favor of plaintiffs on the

competing breach of contract claims and awarding them damages. The court also found plaintiffs were the prevailing parties under the contractual fee-shifting provisions and awarded them reasonable attorney fees and costs.

¶ 20 LSL responded with its motion to amend the amended findings and judgment, arguing that (1) plaintiffs "failed to prove they performed" under the contracts, and (2) LSL complied with the termination clause by providing oral notice to plaintiffs during the August 2022 phone call.

¶ 21 The court denied the motion. It reaffirmed its amended findings that "LSL was required to follow the [c]ontracts' notice-and-cure provision before terminating the [c]ontracts" and that, "viewing the [c]ontracts and the course of performance as a whole, [p]laintiffs substantially performed their contractual obligations." The court also rejected LSL's second argument, finding that the contracts required written notice.

¶ 22 The court then denied LSL's alternative post-trial motion, seeking to amend plaintiffs' damages award.

## G. The Appeal

¶ 23    LSL now asks us to reverse the court's judgment or, alternatively, remand for recalculation of plaintiffs' damages award. Plaintiffs respond that we do not have jurisdiction over this appeal, but, if we do, they ask us to affirm the judgment.

## II. Jurisdiction

¶ 24    Plaintiffs contend that because LSL filed its notice of appeal before the court ruled on LSL's post-trial motions (and did not file an amended notice of appeal after the court ruled), this court lacks jurisdiction over the appeal.

¶ 25    Even assuming that LSL's notice of appeal was premature, an appellate court may exercise jurisdiction over the appeal if the jurisdictional defect has been cured, and the appellee is not prejudiced by the early filing. *See Ditirro v. Sando*, 2022 COA 94, ¶ 28; *see also Musick v. Woznicki*, 136 P.3d 244, 246-47 (Colo. 2006) (holding that, if a party files a premature notice of appeal, an appellate court may exercise jurisdiction over the appeal once the jurisdictional defect has been cured by entry of a final judgment).

¶ 26    Because any jurisdictional defect has since been cured, and plaintiffs allege no prejudice from the premature filing of the notice of appeal, we conclude that we have jurisdiction.

### III.    LSL's Termination of the Contracts

¶ 27    LSL contends the district court erred by finding that (1) the notice and cure provisions required written notice, and (2) it breached the termination provisions by not providing plaintiffs with a reasonable opportunity to cure.

### A.    Standard of Review

¶ 28    We review a judgment following a bench trial as a mixed question of fact and law. *State Farm Mut. Auto. Ins. Co. v. Johnson*, 2017 CO 68, ¶ 12; *accord JD Wealth LLC v. U.S. Bank Nat'l Ass'n, ND*, 681 S.W.3d 320, 326 (Mo. Ct. App. 2023). That means we defer to the district court's credibility determinations and will disturb its factual findings only if they are clearly erroneous and not supported by the record. *Amos v. Aspen Alps 123, LLC*, 2012 CO 46, ¶ 25; *accord JD Wealth*, 681 S.W.3d at 326. But we review questions of law — such as contract interpretation — de novo. *Sch. Dist. No. 1 v. Denv. Classroom Tchrs. Ass'n*, 2019 CO 5, ¶ 11; *accord JD Wealth*, 681 S.W.3d at 326; *see also Lopez v. GMT Auto Sales, Inc.*, 656

S.W.3d 315, 321 (Mo. Ct. App. 2022) (noting that contract interpretation is reviewed de novo).

¶ 29    Because the contracts have Missouri choice of law provisions, we apply that state's substantive law but Colorado's procedural law. *See Target Corp. v. Prestige Maint. USA, Ltd.*, 2013 COA 12, ¶¶ 13, 15.

### B.    The Contracts' Termination and Notice Provisions

¶ 30    The termination for cause provisions list three "occurrences" for which the contracts "may be terminated for [c]ause by [LSL], immediately upon notice to [plaintiffs] delivered in accordance with the provisions of [the contracts]."  The provisions then continue:

> [I]n the event that [LSL] believes that [plaintiffs have] materially failed or refused to adhere to the provisions of [the contracts], or [have] failed or refused to faithfully and diligently perform the Services, *then [LSL] shall provide notice to [plaintiffs] of the circumstances of such determination*; and [plaintiffs] shall have a reasonable period of time, commensurate with the nature and gravity of the circumstances, to cure said circumstances.  However, said reasonable period of time shall never exceed sixty (60) days.  If the circumstances remain uncured following such reasonable period of time, [LSL] shall be permitted to terminate [the contracts] for cause after giving ten (10) days prior written notice to [plaintiffs].

10

(Emphasis added.)

¶ 31     The notice provisions state:

> *Any and all notices* or other communications
> or deliveries *required or permitted to be given or
> made pursuant to any of the provisions* of [the
> contracts] shall be deemed to have been duly
> given or made for all purposes: (i) if hand
> delivered, on the day delivered; (ii) if sent by
> email or telephone facsimile transmission
> during normal business hours on a business
> day (with prompt oral confirmation of receipt),
> on the day sent; (iii) if sent by a nationally
> recognized overnight courier, costs prepaid, on
> the next business day after being deposited
> with such courier; or (iv) if mailed by first-class
> mail, postage prepaid and return receipt
> requested, on the third (3rd) day after being
> deposited in the mail, in each case to the
> applicable address set forth below or to such
> other address as such party has designated by
> notice so given to the other party . . . .

(Emphasis added.)

## C.     Written Notice

¶ 32     LSL disputes that the contracts required written notice and an opportunity to cure. It maintains that it complied with the contracts' termination and notice provisions because it provided "verbal notice" of the "circumstances" of its determination of plaintiffs' failure to perform under the contracts during the August 2022 call.

11

¶ 33    We disagree for two reasons.  First, the argument is not consistent with the plain and unambiguous contract language.  *See Andes v. Albano*, 853 S.W.2d 936, 941 (Mo. 1993) ("[L]anguage that is plain and unambiguous on its face will be given full effect within the context of the agreement as a whole . . . .").  The notice provisions clearly contemplate written notice for "any and all notices or other communications or deliveries required" under the contracts.  And notice and a reasonable opportunity to cure *are required* before LSL can terminate the contracts.  Reading the provisions together, we have little trouble concluding that written notice and an opportunity to cure were required under the contracts.

¶ 34    Second, LSL's claim is without record support.  The court never found that LSL provided "verbal" notice and an opportunity to cure during the August 2022 call.  Regarding that call, all the court said was that plaintiffs disputed that they had not performed and

that the parties "came to an impasse and closed by agreeing to continue to talk."[1]

### D. Opportunity to Cure

¶ 35 LSL contends that its written notices complied with the notice and cure provisions. It says that the written notices provided sufficient notice of the "circumstances" of plaintiffs' performance failures and identified two issues requiring cure — payment of over $9 million and the replacement of "key managers." And it insists that the district court did not explain why the notice letters failed to satisfy the notice and cure provisions or "how [p]laintiffs were prejudiced."

¶ 36 But the record belies these contentions. The court specifically found, among other things, as follows:

- The notice and cure provisions were "a material and essential part of the [c]ontracts."

---

[1] It's unclear to us — and LSL doesn't explain — why the form of the notice to cure matters. After all, the court's finding that LSL did not comply with the notice and cure provisions did not turn on the *timing* of the notices or the technical failure to comply with the termination provisions. The court instead found that the notices — which primarily demanded over $9 million — did not provide a reasonable opportunity to cure any alleged performance failures under the contracts.

- The contracts "obligated [plaintiffs] with innumerable responsibilities" covering cultivation, extraction and retail and that failure to perform required "a highly subjective evaluation."

- The notices "failed to provide [p]laintiffs a reasonable opportunity to cure," which was "the primary condition" of the notice and cure provisions.

- Instead of contemporaneously notifying plaintiffs of performance problems when they could be cured, LSL waited several months and then sent notices when "there was no longer any reasonable possibility of cure."

- By July 2022, LSL treated the contracts as "totally breached."

- Instead of notifying plaintiffs of a breach in July 2022, LSL "hid in the weeds," concealed its intentions, and prepared a damages calculation.

- The notices of material breach sent in November 2022 largely lacked the specificity necessary to permit an opportunity to cure.

- LSL's demand for a $9 million payment to "cure" was "utterly untethered from reality."

- LSL's conduct with respect to the notices was in bad faith and violated the contracts' duty of good faith and fair dealing.

¶ 37 Thus, the court found that, "through both their timing and substance," the notices provided plaintiffs with no opportunity to cure. Because the court found that LSL failed to comply with the notice and cure provisions, the court found that "its termination was ineffective."

¶ 38 LSL does not challenge the court's factual findings, and, in any event, they have record support. Indeed, LSL admitted that it treated the contracts as being "totally breached" by July 2022. And the evidence shows that LSL then waited several months before sending plaintiffs the purported notices to cure.[2] The $9 million that LSL demanded in the purported notices appeared to be simply a demand for contract damages. It wasn't tethered to any

---

[2] In his trial testimony, an LSL representative referred to the purported notice to cure as a "demand letter," perhaps evidencing its true purpose.

contractual requirement that plaintiffs share in profit loss or any other specific performance failings under the contracts. And critically, an LSL representative testified that LSL knew the $9 million demand wasn't realistic because plaintiffs didn't have "that kind of money around." He also admitted that he had testified at his deposition that he "assume[d]" plaintiffs would not be able to satisfy the cure demands and that he had spent months on "the plan to terminate" the contracts.

¶ 39    LSL seems to suggest that sending notices with two purported cure demands — one of which it assumed plaintiffs could not meet — and providing the required sixty-day cure period was sufficient under Missouri law to satisfy the contracts' notice and cure provisions. But Missouri recognizes that every contract imposes upon each party a "duty of good faith and fair dealing" in the performance and enforcement of the contract. *Martin v. Prier Brass Mfg. Co.*, 710 S.W.2d 466, 473 (Mo. Ct. App. 1986) (citation omitted). "That duty prevents one party to the contract to exercise a judgment conferred by the express terms of agreement in such a manner as to evade the spirit of the transaction or so as to deny the other party the expected benefit of the contract." *Id.* The contracts

empowered LSL with the exclusive determination of whether plaintiffs "failed or refused to faithfully and diligently perform" the services and required LSL to provide plaintiffs notice of its determination and an opportunity to cure any identified deficiencies. As explained, the court found LSL *never intended* for plaintiffs to cure, acted in bad faith, "hid in the weeds," concealed its intentions, and breached its duty of good faith and fair dealing. These findings are supported by the record, and we will not disturb them.[3]

¶ 40 LSL spills much ink over *Homefield Commons Homeowners Ass'n v. Roy H. Smith Real Estate Co.*, 500 S.W.3d 910 (Mo. Ct. App. 2016). It argues that because the court in that case found that a written notice to cure letter satisfied a similarly worded notice and cure provision, the district court erred by not reaching the same result in this case. But as the district court noted, the cases are

---

[3] LSL briefly states the district court erred by finding it breached its duty of good faith and fair dealing. But, beyond simply citing a case, it does not develop this argument or explain its relevance in the context of the case. And "[w]e don't consider undeveloped and unsupported arguments." *Woodbridge Condo. Ass'n v. Lo Viento Blanco, LLC*, 2020 COA 34, ¶ 41 n.12, *aff'd*, 2021 CO 56; *accord Lemay v. Hardin*, 108 S.W.3d 705, 709 (Mo. Ct. App. 2003).

factually distinct. The court in *Homefield Commons* did not find that one party acted in bad faith or sent a notice designed to prevent the other party from curing the breach. Thus, *Homefield Commons* adds little to the issue of whether LSL satisfied the notice and cure provisions. Because the record supports the court's findings that LSL breached the notice and cure provisions, and because notice and an opportunity to cure were preconditions to contract termination, the court correctly concluded that the termination was ineffective. *See id.* at 914 ("A contract covering a certain period of time, but containing a conditional provision that it might be terminated before that time, will remain effective the full term, unless the condition of termination is fully complied with." (citation omitted)); *see also Deutsch v. Boatmen's Nat'l Bank of St. Louis, N.A.*, 991 S.W.2d 206, 208 (Mo. Ct. App. 1999) ("Performance of conditions precedent is an essential element of a claim for breach of contract.").

¶ 41    Given all this, we affirm the district court's finding that LSL did not comply with the notice and cure provisions and that LSL's termination was not effective.[4]

IV.    Substantial Performance

¶ 42    LSL argues that the district court erred by "concluding that [p]laintiffs' material failures to perform were 'excused or cured' by LSL's alleged deficiencies in terminating the [c]ontracts — after learning of [p]laintiffs' breaches — thereby absolving [p]laintiffs of their burden to prove performance of their contractual obligations."

¶ 43    But LSL's premise that the court found that plaintiffs breached the contracts either misapprehends or ignores the court's amended findings of fact and conclusions of law.  It's true that the court initially found that plaintiffs breached the contracts, and, under Missouri's "first to breach rule," plaintiffs were barred from recovery.  *Barnett v. Davis*, 335 S.W.3d 110, 112 (Mo. Ct. App. 2011) (discussing Missouri's "first to breach rule," which provides

_____

[4] Having so concluded, we necessarily do not consider LSL's contention that the district court erred by finding that LSL failed to prove its damages.

19

that "a party to a contract cannot claim its benefit where he is the first to violate it" (citation omitted)).[5]

¶ 44 The court, however, later amended its findings of fact and conclusions of law and found the opposite. Specifically, after finding that LSL did not give plaintiffs an opportunity to cure any material performance failures in the summer of 2022, the court found that LSL's contract termination was not effective. And because LSL deprived plaintiffs of the contractually required opportunity to cure, the court found that plaintiffs' "failure to perform never matured into a breach." Even more significantly, the court found that, after considering plaintiffs' performance over the course of the contract (including the period of nonperformance) and

---

[5] Though not cited in the appellate briefs or in the district court's original or amended findings of fact and conclusions of law, *Barnett v. Davis*, 335 S.W.3d 110, 112 (Mo. Ct. App. 2011), provides that Missouri's "first to breach rule" only applies if the breach is material. It then outlines factors a court should consider in determining whether a breach is material. *Id.* at 114-15. Had the district court expressly considered the factors — which include the "extent to which the injured party will be deprived" of the contract benefit and the likelihood the breaching party will cure "considering all relevant circumstances" — along with its findings that LSL acted in bad faith, it's unclear to us whether the court would have characterized plaintiffs' 2022 performance problems as "material." *Id.*

the fact that LSL did not intend for plaintiffs to cure, plaintiffs substantially performed under the contracts.  Indeed, the court clarified in a post-trial ruling, "[I]n case it was not clear previously, . . . viewing the [c]ontracts and the course of performance as a whole, [p]laintiffs substantially performed their contractual obligations."

¶ 45     Thus, to the extent LSL maintains that plaintiffs breached (or were the "first to breach") the contracts, that's not what the court found.  And LSL does not suggest that the court's factual findings are without record support or provide any reason for us to depart from them.  *See Smith-Scharff Paper Co. v. Blum*, 813 S.W.2d 27, 28 (Mo. Ct. App. 1991) (in Missouri, it is "well settled law" that deference is "not limited to determinations as to the credibility of witnesses" but "extend[s] to all fact issues found in accordance with the result reached by the trial court.").

¶ 46     Even so, LSL contends that the court "effectively excus[ed] [p]laintiffs from proving the performance element" because it excused plaintiffs' nonperformance for the period that LSL failed to allow plaintiffs an opportunity to cure.  But, again, the record belies this contention.  The court found that plaintiffs substantially

21

performed over the course of the contract. To the extent LSL claims that the court erred by excusing plaintiffs' performance for that period in which LSL did not inform plaintiffs of any performance problems and then later breached the notice and cure provision, we disagree. After all, a party can't cure any claimed performance problems unless it is notified of the problem and given the chance to cure it. And even if plaintiffs were not materially performing at some point in 2022, "a party in breach may cure [its] breach 'by correcting the deficiency in [its] performance.'" *Barnett*, 335 S.W.3d at 113 (citation omitted). That's only true, of course, if the breaching party is given the opportunity to cure. The court found that LSL didn't provide that opportunity. *Cf. Consol. Serv. Grp., LLC v. Maxey*, 452 S.W.3d 768, 770 (Mo. Ct. App. 2015) ("[I]f [one party] is prevented from completing the work on a construction project by the actions of the [other party], the [obstructing party has] breached the contract." (citation omitted)).

¶ 47 For that reason, we again disagree with LSL that *Homefield Commons* informs our analysis. In that case, a homeowners association entered a contract with a management company to manage a subdivision. 500 S.W.3d at 911. The contract had a

22

termination provision that required notice and an opportunity to cure. *Id.* at 912. The association purported to comply with the termination clause and then terminated the contract. The parties filed competing breach of contract claims. After a bench trial, the court found that the association had satisfied the termination clause and did not address the management company's breach of contract counterclaim. *Id.* at 913. The appellate court reversed, concluding that because the association did not "fully comply" with the contract's termination conditions it "did not properly terminate the contract." *Id.* at 916. But because the trial court *never considered* the management company's breach of contract counterclaim, it made "no factual findings" on that claim. *Id.* For that reason, the court remanded the counterclaim for the trial court's consideration. *Id.* at 917.

¶ 48 Unlike *Homefield Commons*, the district court considered and ruled on plaintiffs' breach of contract claims and found that, considering plaintiffs' performance over the course of the contract period, plaintiffs substantially performed the contracts. And when — as here — performance issues are disputed, whether a party has substantially performed is a question of fact. *See C.A.*

*Bianco, Inc. v. Hoechst*, 661 S.W.2d 567, 571 (Mo. Ct. App. 1983). We cannot say that the district court's finding that plaintiffs substantially performed was clearly erroneous. *See JD Wealth*, 681 S.W.3d at 326.

## V.    The Damages Award

¶ 49    LSL next asks us to remand for recalculation of plaintiffs' damages award because it says that the district court erred by including intercompany sales in the damages award.

### A.    Legal Principles and Standard of Review

¶ 50    "To recover lost profits stemming from a breach of contract, a plaintiff need only prove the fact of damages with reasonable certainty and provide an adequate basis for the [fact finder] to estimate the lost profits with reasonable certainty." *Midwest Coal, LLC v. Cabanas*, 378 S.W.3d 367, 371 (Mo. Ct. App. 2012). "'[C]ertainty' means that damages have been suffered and not exact proof of the amount of the damages." *Harvey v. Timber Res., Inc.*, 37 S.W.3d 814, 819 (Mo. Ct. App. 2001).

¶ 51    Because the amount of damages is a factual question, *see High Life Sales Co. v. Brown-Forman Corp.*, 823 S.W.2d 493, 502

(Mo. 1992), we will not set aside a damage award unless it is clearly erroneous, *see JD Wealth*, 681 S.W.3d at 326.

### B. Sufficient Evidence Supports the Damages Award

¶ 52    The contracts provide that plaintiffs "shall receive a management fee" during the contract term equal to three percent of LSL's gross monthly sales. Gross monthly sales "means the actual cash collected for overall sales of [LSL], unadjusted for costs incurred in generating those sales."

¶ 53    LSL argues that because intercompany sales do not qualify as "actual cash collected," intercompany sales are not included in gross monthly sales. Thus, LSL says that the court erred by including intercompany sales in the damages award. The contracts, however, don't define "actual cash collected" and say nothing about whether intercompany sales are included in "actual cash collected." We therefore disagree that the damages award "contradicts" the contractual definition of gross monthly sales.

¶ 54    LSL also faults the court for relying on plaintiffs' damages expert who included intercompany sales in his damages calculation. But the court considered the damages testimony and found that the expert's calculations were based on LSL's financial statements,

which did not "break out intercompany transactions from other sales," and at least one LSL document that included intercompany sales. Because LSL offered no competing damages expert or an alternative damages calculation, and because the court found plaintiffs' expert credible, the court adopted the expert's damages calculation. *See State v. Mackey*, 698 S.W.3d 853, 858 (Mo. Ct. App. 2024) (the district court is "free to credit all, part, or none of the expert's testimony.").

¶ 55 In the end, it was for the court to consider and weigh the damages evidence. The court's damages award is supported by the record and consistent with the law. We therefore will not disturb it.

## VI. Appellate Attorney Fees and Costs

¶ 56 Both parties request an award of appellate attorney fees and costs under the contracts' prevailing party provisions and C.A.R. 39.1. Because we affirm the judgment, we grant plaintiffs' request and deny LSL's request. We exercise our discretion to remand the case to the district court to determine plaintiffs' reasonable appellate attorney fees and costs. *See* C.A.R. 39.1.

## VII. Disposition

¶ 57    The judgment is affirmed, and the case is remanded to the district court to determine the amount of appellate attorney fees and costs to be awarded to plaintiffs.

JUDGE LIPINSKY and JUDGE KUHN concur.